IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Allegheny County,              :
Pennsylvania,                  :
                               :
                  Appellant    :
                               :
           v.                  : No. 1122 C.D. 2023
                               : Argued: May 23, 2024
Allegheny County Prison Employees  :
Independent Union              :


BEFORE:   HONORABLE MICHAEL H. WOJCIK, Judge
          HONORABLE MATTHEW S. WOLF, Judge
          HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK                         FILED: August 7, 2024


        Allegheny County (County) appeals from an order of the Court of
Common Pleas of Allegheny County (trial court) that denied its petition to vacate an
arbitration award (Arbitration Award) because the County failed to prove that the
Arbitration Award did not draw its essence and was not rationally derived from the
language of the collective bargaining agreement (CBA) between the County and the
Allegheny County Prison Employees Independent Union (Union). At issue is the
Union's grievance over whether the County had just cause to discipline two
correctional officers (COs) employed at the Allegheny County Jail (ACJ), who each
received a one-day unpaid suspension for failing to report for mandatory overtime
shifts because they were too fatigued to ensure they could be alert on the required
overtime shift. The County presents two questions on appeal: whether the trial court

erred in denying the County's petition to vacate the Arbitration Award where the Arbitration Award amends the CBA regarding mandatory overtime and violates the essence test; and whether the trial court erred in denying the County's petition to vacate the Arbitration Award where the arbitrator's conflicting resolution of the mandatory overtime dispute is not rationally derived from the CBA and violates the essence test. After careful review, we affirm.

The background facts as found by the arbitrator are not in dispute.[1] The County operates the ACJ, and the County and Union are parties to a CBA that was first entered into in 1994, which has been amended several times by way of binding interest arbitration awards, the latest of which covers the period from July 1, 2019, to December 31, 2023. Reproduced Record (R.R.) at 1a-139a.[2] ACJ employees are also subject to the County Code of Ethics through County Policy 605 (Code of Ethics). *Id.* at 168a-181a.[3] The Code of Ethics requires COs to be alert and vigilant,

---

[1] The Arbitration Award, April 3, 2023, may be found in the Reproduced Record (R.R.) at 360a-88a.

[2] Relevant here, Article IV.1 of the CBA provides that "[t]he Union recognizes that it is absolutely necessary for the County to be operated on a twenty-four (24) hour, seven (7) day a week basis and that the County's operations be properly manned." R.R. at 11a. Article VIII.1.F. of the CBA requires that mandatory overtime be assigned in reverse seniority order and establishes a procedure to equalize overtime among employees. *Id.* at 126a. Article XVIII.1 of the CBA provides that the County has the right to discharge or suspend any employee for just cause. *Id.* at 35a.

[3] The Code of Ethics provides, in relevant part, that certain behaviors by ACJ employees are strictly prohibited, including "dereliction of duty," defined as: "An [e]mployee who is derelict has willfully refused to perform his/her duties or has incapacitated one[']s self in such a way that he/she cannot perform his/her duties. Such incapacitation includes but is not limited to falling asleep on duty requiring wakefulness . . . ." R.R. at 170a. The Code of Ethics further provides that "[a]ll employees will carry out all orders and directives issued or given them by a supervisor, in a prompt and efficient manner. DISREGARD OF ORDERS AND DIRECTIVES ISSUED BY A SUPERVISOR IN A WILFUL OR DILATORY MANNER WILL BE CAUSE FOR SEVERE **(Footnote continued on next page…)**

2

particularly due to the security risks and dangers in the ACJ. The County reserves the right to discipline COs for violations of the Code of Ethics, including the failure to be sufficiently alert and vigilant while working. *Id.* at 365a. The ACJ houses inmates in various units and pods and is continuously staffed with COs 24 hours per day, 7 days per week, with scheduled shifts every day from 7:00 a.m. to 3:00 p.m., 3:00 p.m. to 11:00 p.m., and 11:00 p.m. to 7:00 a.m. *Id.* at 363a. A CO may volunteer or be mandated to work additional hours or shifts to cover staffing shortages. *Id.* The County has always had the authority to determine when additional COs are needed for a particular shift and to mandate COs work additional shifts if sufficient volunteers cannot be obtained. *Id.* at 364a. The record reflects that the County has been faced in recent years with an increasingly severe staffing shortage, and the amount of forced overtime has increased substantially over the last several years. The provisions in the CBA for mandating overtime utilize a process of inverse seniority and the approximate equalization of overtime among employees. The CBA also includes a provision whereby the Union and the COs accept responsibility to exert "every effort to ensure that all shifts are properly manned at all times." *Id.* at 11a, 364a.

The arbitration proceeding arose out of two, essentially identical disciplinary actions taken by the County against CO Justin Drexler (Grievant Drexler) and CO Courtney Cornell (Grievant Cornell), (together, Grievants). R.R. at 364a. The County issued Grievant Drexler a one-day unpaid suspension for refusing a mandatory overtime shift on April 12, 2022. The County issued Grievant Cornell a one-day unpaid suspension for refusing a mandatory overtime shift on May 10, 2022. *Id.* The Union grieved Grievants' one-day suspensions, which proceeded

DISCIPLINARY ACTION UP TO AND INCLUDING DISCHARGE." *Id.* at 176a (emphasis in original).

3

through the grievance process and were consolidated before Arbitrator Ronald Talarico for a final and binding determination. *Id.* A hearing was held before the arbitrator on December 12, 2022, at which the County and Union were represented by counsel and presented testimony and documentary evidence. The arbitration hearing was not transcribed. The grievances arose out of similar situations "where each CO was mandated to work an overtime shift and declined on the basis of fatigue." *Id.* There is no dispute that the County followed the process in the CBA for mandating overtime for Grievants. The circumstances involved "multiple consecutive days of mandatory overtime" which Grievants "claimed placed them in a position of being unable to perform their jobs at the level of proficiency expected by the County." *Id.*

At the hearing, the County introduced evidence that approximately 60% of COs at the ACJ have some sort of pre-approved intermittent leave under the Family and Medical Leave Act of 1993 (FMLA).[4] R.R. at 365a. A CO may avoid or decline mandatory overtime by using FMLA where appropriate, or through application of the Americans with Disabilities Act (ADA).[5] *Id.* In addition, COs can trade shifts and volunteer for overtime shifts to avoid mandated overtime on a shift or unit that involves less desirable or more strenuous work. Generally, however, COs understand they will be working a significant amount of overtime due to staffing shortages at the ACJ, which have increased over the past several years. *Id.*

Grievant Drexler began working as a CO at the ACJ in 2019, where he was assigned to an acute mental health unit during the 11:00 p.m.-7:00 a.m. shift,

---

[4] 29 U.S.C. §§2601, 2611-2620, 2631-2634, 2651-2654.

[5] 42 U.S.C. §§12101-12213.

4

with Tuesdays and Wednesdays as his scheduled days off.  R.R. at 365a.  Grievant Drexler worked four consecutive double shifts, 16 hours per day for four days straight, on April 7, 8, 9, and 10, 2022.  *Id.*  Grievant Drexler was contacted during his shift that started at 11:00 p.m. on April 11, 2022, and informed that he would be required to work a fifth consecutive double shift, meaning that he would work his regular eight-hour shift and then work a second eight-hour shift commencing at 7:00 a.m. on April 12, 2022.  *Id.*  Grievant Drexler informed his supervisor that he would work his scheduled shift but refused the mandatory overtime shift.  Grievant Drexler testified that the basis for his refusal was his "fear that he would be unable to remain sufficiently alert and vigilant to meet the County's requirements, primarily due to the lack of enough rest resulting from already working four, consecutive [16]-hour workdays," plus the regular shift on April 11, 2022.  *Id.*  The County requires a CO to indicate the basis for refusing mandated overtime on a form, on which Grievant Drexler marked "other," because there was no specific designation for a CO to indicate fatigue.  *Id.* at 366a.  Grievant Drexler explained his reason for refusing the mandated overtime shift throughout the grievance process, during his pre-disciplinary interview, and through his testimony at the arbitration hearing.  *Id.*  The Union introduced documentary evidence that Grievant Drexler had worked 271 hours of overtime in the first three months of 2022, and 76 hours of overtime through the end of April 2022.  *Id.*

Grievant Cornell began working as a CO at the ACJ in 2019, where she was assigned to a maximum security unit during the 11:00 p.m.-7:00 a.m. shift, with Tuesdays and Wednesdays as her scheduled days off.  R.R. at 366a.  Grievant Cornell worked three, consecutive double shifts, 16 hours per day for three days straight, on May 6, 7, and 8, 2022.  *Id.*  Grievant Cornell was contacted on Monday,

5

May 9, 2022, and informed that she would be required to work a fourth consecutive double shift, meaning that she would work her regular eight-hour shift on May 9, 2022 and then work a second eight-hour shift commencing at 7:00 a.m. on May 10, 2022. *Id.* Grievant Cornell informed her supervisor that she would work her scheduled shift but refused the mandatory overtime shift. Grievant Cornell testified that the basis for her refusal was her "fear that she would be unable to remain sufficiently alert and vigilant to meet the County's requirements, primarily due to the fact that she had already worked three, consecutive [16]-hour workdays," plus the regular shift on May 9, 2022. *Id.* Grievant Cornell testified that she "'hit a wall, became irritable, had trouble focusing and suffered memory problems,' which she felt rendered her unable to meet the County's job requirements" on the mandatory overtime shift on May 10, 2022. *Id.* Grievant Cornell also checked "other" on the form refusing mandatory overtime. The Union introduced documentary evidence that Grievant Cornell had worked 262 hours of overtime in the first four months of 2022, and 82 hours of overtime through the end of May 2022. *Id.* at 367a.

Grievant Drexler could have, but did not, refuse the mandatory overtime under his pre-approved intermittent FMLA leave. Grievant Cornell did not qualify for intermittent FMLA leave. R.R. at 367a. Some COs, including Grievants, sought a meeting with the ACJ Warden, which was held on April 15, 2022, to address COs' concerns about the "extreme amount of mandated overtime" being forced on staff, and how to alleviate the strain. *Id.* The Union asserted that this effort by COs supported the claim that mandated overtime was pushing COs to the point where they could not safely and properly perform their jobs. *Id.*

The County imposed the one-day suspensions on Grievants for, among other things, disregarding the directive of a supervisor and dereliction of duty. R.R.

6

at 367a. The County asserted that more severe disciplinary action could have been justified and that the level of discipline was reasonable. *Id.* at 368a. The County also asserted that the Union and Grievants "planned the refusals" as a test case, attempting to set parameters for other COs to refuse mandatory overtime. *Id.* The Union maintained that Grievants approached the matter conscientiously and sought a solution that would permit them to meet their work responsibilities safely. The Union advocated for a case-by-case analysis for determining whether a CO could or should refuse mandatory overtime based on genuine safety reasons. *Id.*

The issue presented to the arbitrator was whether the County had just cause to suspend Grievants for one day without pay, and if not, what shall be the appropriate remedy. R.R. at 368a. The arbitrator summarized the positions of each party and observed that

> there are very compelling interests on both sides of the case. Both parties seek not only a decision on each [g]rievance, but also guidance or precedent that will be important moving forward. This is most likely because the underlying circumstances that brought these situations forward [increasing staffing shortages at the ACJ] are not likely to go away anytime soon.

*Id.* at 377a. The arbitrator observed that the County has a "fundamental obligation to maintain and operate the ACJ in a safe and secure manner," and that safety concerns "are implicated in every staffing decision made by the County." *Id.* The arbitrator explained that it was

> not at all surprising that the County has for decades handled short-term staffing issues by mandating COs to work overtime, and this approach is plainly endorsed through various provisions in the [CBA]. Part of that procedure is to attempt an overall equalization of overtime, but the final step in every short-staffing situation is to mandate a [CO to work overtime.]

7

*Id.* at 377a-78a. The arbitrator identified the Union's important interest as "being able to deliver on the expectations the County sets out for its workforce: employees in this dangerous and demanding environment must be alert and vigilant to help maintain the safety and security of the ACJ." *Id.* at 378a. ACJ employees are subject to discipline under the Code of Ethics if they fail to remain alert and vigilant on duty. COs also understand that "a situation can quickly turn dangerous even under the best of circumstances," and an employee who is "unduly fatigued or unable to focus on his/her duties can present an immediate danger to themselves and others." *Id.* The Union posited that COs who must work long hours without adequate rest will have their job performance "inevitably decline" to an unacceptable level. *Id.*

The arbitrator acknowledged that the County "has a very daunting problem" in ascertaining whether a CO has reached the point of "an unacceptable decline brought on by extended work hours and fatigue." R.R. at 378a. The arbitrator found that "anyone working multiple [16]-hour shifts for consecutive days will sooner or later become tired or fatigued. The question is how to determine when that tiredness or fatigue has actually reached a level that will significantly affect the person's job performance." *Id.* Given that different employees will have different capacities to adapt to the work scheduled, the arbitrator concluded that "[t]here are no tests that can be administered beforehand to figure out if an employee is sufficiently fatigued so as to be incapable of being sufficiently alert and vigilant; the only 'test' is to examine on a post hoc basis the employee's actual job performance." *Id.*

Critically, the arbitrator outlined what was properly before him, and what was not.

> It is very apparent that there is no contractual basis in the parties' [CBA] for an arbitrator to evaluate each case using a bright-line rule where employees may refuse mandated

8

> overtime due to fatigue. To the extent that such a bright-line rule would be helpful or valuable, that is for the parties to address through their negotiations. As noted above, there are very serious concerns on both sides of the issue, and the parties are best suited to determine (1) if there should be a bright-line rule, and (2) how is that bright-line applied in each case? Those answers simply cannot be derived from a grievance/arbitration hearing.

R.R. at 379a.

The arbitrator concluded that "[i]t would be entirely inappropriate for this [a]rbitrator to attempt to establish any type of bright-line rule on a subject over which the parties have never been able to agree. The parties can and should address the deeper issues between them when they engage in bargaining." R.R. at 380a. The arbitrator continued:

> Accordingly, it is the intention of this [a]rbitrator to evaluate each grievance solely on the facts and circumstances unique to said [g]rievance and render a decision that applies only to that [g]rievance. Drawing a bright line to cover all situations is the responsibility of the parties. Determining whether just cause existed in each of these individual cases, without interfering in the overall bargaining relationship, is within the authority of the arbitrator.

*Id.*

The arbitrator acknowledged the County's valid concern that allowing employees to make the decision whether to refuse mandatory overtime would endanger the safety of both staff and inmates. R.R. at 379a. The arbitrator found no evidence in the record that Grievants "acted in concert, or that the Union encouraged either officer to refuse a mandated overtime shift as a 'test' case." *Id.* The arbitrator further noted that it should be

> obvious that any decision by an employee to disregard or reject a directive of supervision challenges the very bedrock of the employment relationship. The County

9

must show just cause for discipline in each of these cases, but anytime an employee refuses a mandated overtime shift, that decision must be closely scrutinized.

*Id.* at 380a. The arbitrator concluded that the burden is "largely on the employee to demonstrate" he or she reached the level of fatigue that renders them incapable of performing their job to the level required by the County. *Id.* According to the arbitrator, this requires

> a critical examination of the actual circumstances in which the employee asserted an inability to safely perform the mandated shift due to fatigue. To approach the case otherwise (by establishing some outer limit of hours worked after which *any* employee could refuse a mandated shift on the basis of fatigue) would be to allow the employees to manage the operations of the ACJ. The County is correct that such an outcome would be directly contrary to the unambiguous provisions of the [CBA] securing the County's managerial prerogatives. Moreover, setting any such outer limit should be a matter of bargaining between the parties. The decisions in this case are limited to the facts presented with each [g]rievance and are not intended to set any type of limit for any other case.

*Id.* at 380a-81a (emphasis in original).

The arbitrator then focused on the "fundamental point of disagreement between the parties," namely, "whether there is any type of good-faith defense to the alleged misconduct." R.R. at 381a. The County maintained that employees must obey the directives of management, and employees may not engage in "self-help" when confronted with a directive they are unwilling to accept. *Id.* The Union maintained that an employee should be able to present a good-faith defense to charges of insubordination or dereliction of duty when fatigue resulting from working a grueling schedule renders the employee "temporarily unable" to competently perform their duties on the mandated overtime shift. *Id.* The arbitrator

10

recognized the well-established principle of "work now/grieve later," instead of allowing an employee to simply refuse to comply, which "would argue against any type of good-faith defense." *Id.* The arbitrator concluded that

> [h]owever, in this situation, the County's own job requirements (and the express terms of the [CBA]) dictate that the employees have a responsibility to help "assure that all shifts are properly manned at all times." Even though this phrase supports the County's premise that employees are required to accept mandatory overtime assignments, it also must be interpreted to impose an obligation to be forthright when the employee knows they cannot competently meet that obligation. An employee is "not assuring that all shifts are *properly* manned" if the employee is fully aware that they cannot work up to the expectations required by the County.

*Id.* at 381a-82a (emphasis in original).

The arbitrator reasoned that an employee who accepts a mandatory overtime shift when they are too fatigued to properly perform their duties creates a safety risk. "When this occurs because the County has required the employee to work a significant amount of overtime in a very short timeframe with little opportunity for rest, it is not the fault of the employee that they have become temporarily fatigued." R.R. at 382a. But the employee "will face disciplinary action for these circumstances outside of the employee's ability to control, unless the employee makes the decision to report even though they cannot competently perform the job." *Id.* The arbitrator concluded as follows:

> There has to be room in the just cause analysis to determine, first, if the employee was indeed confronted with such circumstances, and second, whether those circumstances served as a basis for refusal of a mandated overtime assignment. This is both a subjective and objective inquiry. To conclude otherwise would mean that the employee would either have to: (i) accept the

11

assignment knowing full well that they were not going to be able to fulfill the County's expectations and in so doing create an immediate risk of safety and security breaches, or (ii) accept discipline for conduct that is beyond the employee's ability to control. One reason for progressive discipline is to give an employee the opportunity to modify their conduct so as to avoid more serious discipline in the future, but if the discipline is based on factors outside of the employee's ability to control, the discipline becomes arbitrary in nature and lacking in just cause.

*Id.*

Because Grievants were disciplined for "knowing" and "willful" conduct in violation of the Code of Ethics, the arbitrator concluded that

the alleged grievances have a component of intent, and therefore just cause requires the accused to be given the opportunity to disprove that element of the offense. Although it is necessary and appropriate that the opportunity is very narrow, nevertheless each [Grievant] must be given the opportunity to establish that they did not have the requisite intent to act in a manner that would be insubordinate or derelict in their duties.

R.R. at 383a. The arbitrator rejected the County's reading of the CBA focusing only on "mandatory overtime" as too narrow, because it failed to account for other provisions that require "a more informed and balanced approach," in particular the just cause provision, the requirement that employees be wakeful and alert when performing their duties, and employees' responsibility to ensure that all shifts are properly manned. *Id.*

Turning to the individual grievances, the arbitrator concluded that the County had the burden to establish just cause for the one-day suspension imposed on Grievant Drexler, which it did by bringing forth the facts that Grievant Drexler was properly assigned to, and then refused to work, the mandatory overtime shift on April 12, 2022. R.R. at 384a. At that point, the burden shifted to the Union to show

12

that Grievant Drexler's refusal was not a willful disregard of his supervisor's order to report. *Id.* The arbitrator found that Grievant Drexler had already worked four consecutive double shifts and that the mandated overtime shift would have required him to work a fifth consecutive double shift over five days. *Id.* Grievant Drexler "claimed at the hearing, and I [the arbitrator] credit his testimony, that he had become genuinely concerned that he would not be able to continue to work safely if required to work the fifth mandated [overtime] shift." *Id.* The arbitrator also found that the Union demonstrated that Grievant Drexler had a consistent record of working a considerable amount of overtime leading up to, and following, the April 12th incident. *Id.* The arbitrator found nothing in the record to suggest that Grievant Drexler was being less than genuine in asserting that his fatigue jeopardized his ability to perform his job properly. *Id.*

The arbitrator then reviewed Grievant Drexler's work schedule during the week of April 7th and concluded that "during the 104-hour period from 11:[00] p.m. on April 7th through 7:[00] a.m. on April 12th, [Grievant] Drexler had a total of 32 hours where he was not on the clock at work." R.R. at 384a. The arbitrator concluded "[t]hat is an ambitious work schedule to say the least; suffice to say that a workweek consisting of [72] hours of work in less than five calendar days gives rise to some concern about whether the employee is fatigued to the point where the job performance will suffer." *Id.* The arbitrator then reviewed Grievant Drexler's work history in the months leading up to April 2022, and found that he worked 271 hours of overtime in the first three months of 2022, an average of 90 hours per month, and 76 hours of overtime in April 2022. *Id.* at 384a-85a. The arbitrator concluded that these figures supported the Union's contention that Grievant Drexler did not shirk his work responsibilities. *Id.* at 385a.

13

On the basis of these undisputed facts, the arbitrator found that the "Union and [Grievant] Drexler presented sufficient evidence to show, on both a subjective and objective basis, that [Grievant] Drexler had a genuine concern over his ability to safely and properly perform his job" when he declined mandatory overtime on April 12, 2022. R.R. at 385a. The arbitrator concluded that "[t]his evidence, which is in the overall nature of an affirmative defense, satisfied the Union's burden to establish that [Grievant] Drexler, through no fault of his own, had been placed in a situation where he was compelled to refuse" the mandatory overtime shift on April 12, 2022. *Id.* The arbitrator then evaluated the County's response to the Union's affirmative defense, where the County "did not offer any specific evidence" to refute the reasons for Grievant Drexler's refusal. *Id.*

The arbitrator then concluded that "[t]his is the point at which the County failed to meet its overall burden to establish just cause." R.R. at 385a. The arbitrator again acknowledged the County's compelling interest in ensuring staffing at the ACJ but faulted the County's response to Grievants' fatigue as "robotic," because it failed to recognize the "simple fact that any employee will sooner or later reach such a point if pressed hard enough." *Id.* at 386a. The arbitrator concluded that the language in the CBA that requires all parties to "'assure that all shifts are properly manned at all times'" supports the conclusion that the CBA requires "not only that there are enough staff but also that those staff are competent to perform the expected job duties." *Id.* Under the circumstances credited by the arbitrator, "it would have been improper" for Grievant Drexler to report to work for mandatory overtime on April 12th when he was temporarily unable to perform his expected duties due to fatigue, and face discipline for failing to remain alert on duty. *Id.*

14

The arbitrator admitted that it is not at all clear what the County's response should be when an employee genuinely expresses a concern about their ability to work a mandated overtime shift due to fatigue that is supported by both subjective and objective evidence. R.R. at 386a. "What is clear is that a blanket refusal to accept [Grievant] Drexler's decision in this specific situation, without allowing for the possibility that [Grievant] Drexler had legitimately reached the point of being temporarily unable to work the extended shifts" without any consideration of the subjective and objective evidence present, was not "an adequate response in this case." *Id.* at 386a-87a. The arbitrator concluded that

> [w]here the circumstances compelling the refusal are beyond the employee's control, there is no basis to sanction the employee. The County's approach arbitrarily ruled out any consideration of this possibility, even though there were objective factors supporting [Grievant] Drexler's claim. For this reason, the effort to impose discipline was arbitrary and not grounded in just cause.

*Id.* at 387a. The arbitrator further explained that the record was ambiguous regarding the County's treatment of other COs who refused mandatory overtime, or any specific evidence regarding COs use of intermittent FMLA leave, and that this factor did not impact the outcome in either direction. *Id.*

The arbitrator followed the same analysis for Grievant Cornell and found that she "credibly testified" that she felt she had "temporarily reached the limit of her ability to competently perform her job duties" for the mandated overtime shift on May 10th. R.R. at 387a. The arbitrator found, "under the particular circumstances here" there was at least "some objective evidence" that Grievant Cornell had worked consecutive double-shifts before her refusal, worked significant overtime hours in the months before, and immediately after, her refusal, which the County did not refute. *Id.* The arbitrator then concluded that the County failed to

establish just cause for imposing discipline on Grievant Cornell and sustained the Union's grievances. *Id.* at 388a.

The County filed a petition to vacate the Arbitration Award with the trial court, that denied the petition because the County failed to prove that the Arbitration Award did not draw its essence from, or was not rationally derived from, the language of the CBA. Trial Court Opinion, December 18, 2023, at (unnumbered) 4.[6] The trial court concluded that the Arbitration Award met the first prong of the essence test because the issue of whether the County had just cause to suspend Grievants was within the terms of the CBA and the Code of Ethics. *Id.* at 5. The trial court further concluded that the Arbitration Award met the second prong of the essence test and was rationally derived from the CBA because it "does not extend beyond the negotiated terms of the [CBA] or the jurisdiction of the [a]rbitrator, nor violates PERA."[7] *Id.* The trial court explained that although the CBA does not define just cause, Pennsylvania courts have provided some of the factors to be considered including whether there was an investigation, pre-discharge and post-discharge misconduct, a grievant's past employment record, length of service, post-discharge rehabilitation, and unequal treatment of employees in similar situations, citing *Office of the Attorney General v. Council 13, American Federation of State, County and Municipal Employees, AFL-CIO*, 844 A.2d 1217 (Pa. 2004). Trial Court Opinion at 6. The trial court found that the arbitrator correctly limited his determination to just cause and refrained from attempting to establish "any type of bright-line rule over the issue of mandatory overtime and employee fatigue" which

---

[6] The Trial Court Opinion, December 18, 2023, is attached to Appellant's Brief.

[7] Public Employe Relations Act, Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§1101.101-1101.2301.

16

the parties must address in bargaining. *Id.* at 8. The trial court rejected the County's argument that the Arbitration Award "'opens the door'" to allowing employees to avoid mandatory overtime with an allegation of fatigue as "a stretch," because the arbitrator scrutinized the just cause decision on a "case[-]by[-]case basis." *Id.* at 9. The trial court concluded that the arbitrator's decision to

> not create a bright-line rule, but rather to treat these cases on a case-by-case factual basis is a fair application of the essence test of the CBA and a commonsense solution until the parties address this issue at a higher level or in their next [CBA]. The safety situation here is not that different than other industries and professions that regulate the number of consecutive hours worked to the number of hours mandated for rest before being able to work again, i.e., long-haul truck driver and certain health care providers.

*Id.* The trial court then declined to vacate the Arbitration Award on public policy grounds. *Id.* at 9-11.[8] The County then appealed the trial court's order to this Court.

This Court recently stated and summarized the essence test standard of review applicable to this case as follows:

> The essence test is an exceptionally deferential standard, because binding arbitration is a highly favored method of dispute resolution. An arbitrator's award, however, must draw its essence from the [CBA]. Pursuant to the "essence test," an award should be upheld if (1) the issue as properly defined is within the terms of the collective bargaining agreement, and (2) the arbitrator's award can be rationally derived from the [CBA]. That is to say, a court will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the [CBA].

---

[8] The County did not raise the public policy argument before this Court, and we need not discuss it further.

17

*Rose Tree Media School District v. Rose Tree Media Secretaries and Educational Support Personnel Association-ESPA, PSEA-NEA*, 157 A.3d 558, 564-65 (Pa. Cmwlth. 2017) (internal citations omitted).

> When interpreting the CBA, the arbitrator is
>
> not confined to the express terms of the agreement. Our court has stated that an arbitrator's award may draw its essence from the [CBA] if the arbitrator's "interpretation can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention."

*Danville Area School District v. Danville Area Education Association, PSEA/NEA*, 754 A.2d 1255, 1260 (Pa. 2000). Reviewing courts may not second-guess an arbitrator's findings of fact and may not reject them simply because they may disagree with them. *Rose Tree Media Secretaries and Educational Support Personnel Association-ESPA, PSEA-NEA v. Rose Tree Media School District*, 136 A.3d 1069, 1078 (Pa. Cmwlth. 2016). An arbitrator's findings of fact are not reviewable by an appellate court, and as long as the arbitrator "'has arguably construed or applied the [CBA], an appellate court may not second-guess his findings of fact or interpretation.'" *Northumberland County Commissioners v. American Federation of State, County and Municipal Employees, AFL-CIO Local 2016, Council 86*, 71 A.3d 367, 375 (Pa. Cmwlth. 2013) (internal citation omitted). The essence test "does not permit an appellate court to intrude on the domain of the arbitrator and determine whether an award is 'manifestly unreasonable.'" *Id.* (internal citations omitted). An appellate court "must sustain the arbitrator's award if it is based on anything that can be gleaned as the 'essence' of the [CBA]." *Id.* (internal citations omitted).

18

As to the first issue, the County argues that the Arbitration Award violates the first prong of the essence test, because the arbitrator created an exemption to the mandatory overtime provisions of the CBA, when such an exemption does not exist in the CBA. The County objects to what it characterizes as a "piecemeal application" of the just cause provision of the CBA, which results in a modification of the CBA. The Union responds that the Arbitration Award is derived from the just cause language of the CBA, and that the arbitrator's careful reasoning limited the determination to a case-specific analysis of Grievants' subjective and objective reasons for refusing mandatory overtime, rather than establishing a bright-line rule. The Union further argues that the arbitrator's findings and conclusions were based on credited testimony and evidence, and that the Arbitration Award must be upheld if even a reviewing court disagrees with the arbitrator's findings and interpretation of the CBA.

As to the second issue, the County argues that the Arbitration Award cannot be said to be rationally derived from the CBA, when the arbitrator acknowledged that "there are no tests that can be administered beforehand to figure out if an employee is sufficiently fatigued so as to be incapable of being sufficiently alert and vigilant." R.R. at 378a. The County argues that the Arbitration Award places the County in an impossible position when it cannot properly and safely staff ACJ operations, in violation of the County's undisputed authority to mandate overtime in every short-staffing situation as a final step. The Union responds that in the specific circumstances presented, the Arbitration Award was rationally derived from the just cause provision in the CBA, which must permit Grievants to offer genuine fatigue and genuine concern over their abilities to perform as expected, as a defense to the willful or intentional disregard of a supervisor's order.

19

Under the applicable limited standard of review of arbitration awards, we affirm the trial court's denial of the County's petition to vacate, because the Arbitration Award drew its essence and was rationally derived from the CBA. The arbitrator's careful analysis of the circumstances leading to Grievants' refusals of mandatory overtime in the context of just cause is clearly derived from the just cause provision of the CBA. R.R. at 35a. The County's discipline was premised on Grievants' willful disregard of a supervisor's orders and, as such, the County erred by not considering Grievants' good-faith defense to the charges. When, as here, an arbitrator has "'arguably construed or applied the [CBA],'" we "'may not second-guess his findings of fact or interpretation.'" *Northumberland County Commissioners*, 71 A.3d at 375 (internal citation omitted).

Further, we reject the County's argument on the second prong of the essence test, that the Arbitration Award is not rationally derived from the CBA, because the Arbitration Award does not amend the mandatory overtime provisions in the CBA by creating a bright-line fatigue exception. Here, the arbitrator carefully declined to create a bright-line test and reserved the issue for contract negotiation between the parties. The Arbitration Award was specifically limited to the circumstances surrounding Grievants' refusal of mandatory overtime and was not "intended to set any type of limit for any other case." R.R. at 381a. Contrary to the County's argument, the essence test does not permit this Court "'to intrude on the domain of the arbitrator and determine whether an award is []manifestly unreasonable.'" *Northumberland County Commissioners*, 71 A.3d at 375 (internal citation omitted).

20

Accordingly, we affirm the trial court's order.

_____
MICHAEL H. WOJCIK, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Allegheny County,               :
Pennsylvania,                  :
                                    :
             Appellant   :
                                      :
         v.               :  No. 1122 C.D. 2023
                                    :
Allegheny County Prison Employees  :
Independent Union            :

# **O R D E R**

AND NOW, this 7th day of August, 2024, the order of the Court of Common Pleas of Allegheny County dated September 5, 2023, is AFFIRMED.

_____
MICHAEL H. WOJCIK, Judge